## Case No. 9,804.

MORGAN v. NEW ORLEANS, M. & T. R. CO. et al.

[2 Woods, 244.][1]

Circuit Court, D. Louisiana. April Term, 1876.

CONTRACTS — FRAUD IN PROCURING — LEX LOCI CONTRACTUS—EXCEPTIONS—LEX REI SITAE.

1. Where charges of fraud and misrepresentation in procuring a contract, which has been

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

partly performed, are made as the ground for setting it aside, and where a rescission would involve the upsetting of many large and important transactions, the proof should be made clear to justify a court in making the decree prayed for.

[Cited in brief in Flint v. Babbitt, 59 Vt. 194, 9 Atl. 365.]

2. As a general rule a contract is to be governed as to its interpretation, nature, obligation, performance or dissolution, by the law of the place where it was made.

[Cited in Marvin Safe Co. v. Norton, 48 N. J. Law, 415, 7 Atl. 421.]

3. The principal exception to this rule is where the contract is made in one state or sovereignty, to be performed in another; in that case it is to be governed by the law of the place of performance.

4. But where a contract is made in one state, to be partly performed there, and partly performed in several other states, the contract is to be governed by the law of the place where it is made.

[Cited in The Brantford City, 29 Fed. 390; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 455, 9 Sup. Ct. 477.]

5. But in such a case where, in the performance of the contract, conveyances and transfers are to be made of property situate in several states, consisting of realty or other property subject to the local law, the conveyances and transfers should be made in accordance with the lex rei sitae.

[Cited in Marvin Safe Co. v. Norton, 48 N. J. Law, 415, 7 Atl. 421.]

In equity. Heard on pleadings and evidence for final decree. This bill was filed to obtain the rescission of a certain contract made between the complainant [Charles Morgan] and the New Orleans, Mobile & Texas Railroad Company, on December 12, 1871. The rescission was asked for on two grounds: First, on the ground of a fraudulent misrepresentation of facts by which the complainant was induced to enter into the contract; secondly, on the ground that the contract was a commutative one, and that the railroad company had not performed its part of it. The latter ground was based upon the peculiar law of Louisiana, by which, according to the Civil Code, arts. 2045, 2046, "the dissolving condition is that which when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed;" and such "resolutory condition is implied in all commutative contracts, to take effect in case either of the parties does not comply with his engagements."

R. H. Marr, H. J. Leovy, and F. A. Monroe, for complainant.

John A. Campbell, for defendants.

BRADLEY, Circuit Justice. The contract in this case was made for the purpose of putting an end to a ruinous competition which was being carried on between the two parties to it, in the freight and passenger business between Mobile and New Orleans, and for uniting their interest in that business and in a projected railroad business between New Orleans and Texas. The complainant Charles Morgan was, and had long been, engaged in

running a line of steamers between Mobile and New Orleans, the line being supplemented by a short railroad running from Lake Pontchartrain to the latter place, called the Pontchartrain Railroad, of which he owned the majority of the stock. He also owned a railroad called the Opelousas road which ran from the Mississippi river opposite New Orleans to the Atchafalaya river at Brashear City, where it connected with a line of steamers running to Galveston and other places on the Texan coast, being connected with the city of New Orleans by means of a ferry at that place. The complainant also had a charter for a continuation of his railroad from Brashear City westwardly and northwesterly to the Texas state line. The railroad company, at the time of the contract, had recently completed a railroad between Mobile and New Orleans, on which the opposition before referred to was maintained against the steamboat business of the complainant; and they had procured a charter for a railroad from New Orleans to the state line of Texas, and expected to obtain a charter for a continuation of the said road to Houston in that state; and had actually constructed a road west of the Mississippi, from opposite New Orleans, as far as Donaldsonville. Under these circumstances, it became evidently the interest of the parties in some way to compose their differences, and not to continue an opposition which must result in loss to them both. The transportation route between Mobile and New Orleans, being divided between two powerful interests, could not be a very valuable property to either of them unless some amicable arrangement could be made. By the agreement in question, an attempt was made to form such an arrangement. The general nature of it was as follows: Morgan, on his part, agreed to convey to the railroad company and the company agreed to purchase the property which he had in the line between Mobile and New Orleans, for the sum of $797.800, namely. certain wharves and wharf property at Mobile, two steamers, the Laura and the Frances, and his Pontchartrain Railroad stock, amounting to 5,078 shares. out of 7,500 shares, which constituted the whole capital. He further agreed to convey to the company, for the sum of $250.000 and interest thereon from April 15, 1870, his railroad rights and partly constructed road between Brashear City and Vermillionville, about sixty miles, and from thence west and north to the Texas line and to Red river; the company agreeing to complete said road by the time it should complete its main line from Vermillionville to the city of Houston. Morgan further agreed to subscribe to the stock and securities of the railroad company, the sum of $1,258,000, on the same terms as the other subscribers thereto had done, and the price of the property above named was to be taken as payment of his subscription as far as it would go; the balance to be paid by him in cash. The securities to be received by him for his said subscription

were to be $899,000 first mortgage bonds of the company on its road west of the Mississippi, and $359,000 of second mortgage bonds guarantied by the state of Louisiana. He was also to receive (like the other subscribers) income bonds and stock of the company of each, to the amount of his subscription. It was also stipulated in the agreement that Morgan should have for the sum of $250,000 cash, that portion of the Pontchartrain Railroad running along the levee in New Orleans, and the new depot thereto attached. The purpose of the agreement was declared to be to put an end to the opposition in the passenger and freight business between Mobile and New Orleans, and to concede the whole business to the company; and Morgan agreed to take off his boats within fifteen days, and not to run or be concerned in steamboats on that line for fifteen years thereafter. It was further agreed that the gross receipts of the through business by railroad between New Orleans and Houston should, on the completion of the railroad through to the latter city, for seven years thereafter, be stocked and divided between the parties according to the length of railroad owned by each, namely, Morgan's road from New Orleans to Brashear City, and the company's road from New Orleans to Houston, including the branch from Brashear to Vermillionville. The agreement was made and executed in the city of New York, where Morgan and the officers and most of the directors of the company resided; and immediately after it was made, measures were taken to execute it and carry it into effect; and in the course of the following January, February and March almost every article was executed. Morgan subscribed the requisite amount to the securities of the company, in New York. namely. the sum of $1.258.000, and received the bonds and certificate of stock which the agreement called for, and conveyed and transferred to the company the several pieces of property which he was to convey and transfer. namely. the wharves and wharf property in Mobile. the steamers Laura and Frances, the Pontchartrain Railroad stock, and the railroad property and rights northwest of Brashear City: and paid the cash balance required to make up his subscription; and he also received a conveyance of the Pontchartrain Railroad track along the levee in New Orleans, and paid for it the sum of $250,000 in cash. In fact, within three months from the time of making the agreement, everything was done to effect a complete execution of it, except the construction by the company of the railroad to Houston, including the branch road from Brashear to Vermillionville. In addition to this. the firm of C. A. Whitney & Co., of New Orleans. who were the general agents of the complainant in that city, and had managed for him the business between Mobile and New Orleans, and were still managing his line between New Orleans and Texas, were appointed as the agents of the railroad company, and acted as such for several months,

namely, from the date of the agreement in December, 1871, until the latter part of the following April, and Morgan and three or four persons named by him were elected directors of the company in place of others who resigned. In the summer of 1872, the complainant changed the gauge of his road from New Orleans to Brashear City, so as to correspond with that of the defendants, and to be thus prepared for the through business to Houston, and in July he received one installment of interest on the bonds received by him. The defendants on their part, during the spring and summer of 1872, did some work on the line of road between Brashear City and Vermillionville, but never laid any rails there, and entirely suspended operations before the first of September; and nothing further has ever been done on that branch, nor has the road been completed from Donaldsonville to Vermillionville, nor has any part of it been constructed between Vermillionville and Houston. The time when, by the act granting state aid to the company (on which great reliance was placed), and when by express agreement with the state of Louisiana, the railroad company was to complete its road to the state line, was the 7th of May, 1873; and it was to complete the line to Houston within six months thereafter if the requisite legislation could be obtained from the legislature of Texas. In consequence of the failure of the company to furnish funds to pay its debts in Louisiana, and to go on with the work of construction of the railroads in contemplation, Whitney & Co. resigned the agency of the company in the latter part of April, 1872, and they and Morgan resigned their positions as directors. But no formal demand to have the agreement rescinded was made by the complainant until he filed the bill in the present case, which was on the 30th of May, 1873, shortly after the expiration of the time for completing the road to the Sabine river. The bill states, and it is not denied, that the company failed to pay interest on its securities as early as October, 1872, and that the trustees of the first mortgage of the road between Mobile and New Orleans had taken possession thereof, and had received the sanction of the court thereto; and that proceedings had been commenced for a sale of the franchises and property west of the Mississippi. By an amended bill, it is stated that James A. Raynor and Edwin D. Morgan were in possession of the company's road east of the Mississippi, claiming to be in possession as trustees under their first mortgage on that part; and that Frank M. Ames was in possession of the road west of the Mississippi, under a like claim, as trustee under the first mortgage on that part; and they were made parties to the bill, and have severally put in answers setting up their respective claims under said mortgages.

The bill, after setting out most of the foregoing facts, alleges by way of gravamen, that in the negotiation which took place in New York preliminary to the making of the

contract, certain statements and representations were made to the complainant by a committee of the directors of the company, respecting the condition of its affairs, which he was assured were accurate and true, but which he has since discovered to have been false. The bill states that the committee referred to exhibited to the complainant a certain paper (which is referred to as Exhibit E), containing a statement of the condition of the company at that time, showing that the assets of the company then in its possession and available for the construction and equipment of the main line of road to be built from New Orleans to Houston, Texas, and of the branch from Brashear City to Vermillionville, amounted to the sum of $7,551,000, being composed of $4,255,000 of bonds of the company at par, $4,140,000 of Louisiana state bonds, at eighty cents on the dollar, and $1,500,000 second mortgage bonds, at sixty cents on the dollar, and a balance of $488,000 of first mortgage bonds in the Calcasieu Division, all being subject to an amount of $1,404,000 that would be due to original subscribers to a certain fund of "two millions of dollars." Also, that the committee exhibited to the complainant another paper (which is referred to as Exhibit F), which was represented to contain new subscriptions of sums of money to be applied to the construction and equipment of the said main line from New Orleans to Houston; that it had sixty-six names, with an amount affixed to each name, making a total of $4,895,700; and that the subscribers were represented to be, with two or three exceptions, possessed of large means, and able and willing to pay; and that the committee represented that the subscriptions were made in good faith, to furnish the funds required to construct and equip the said railroad west of the Mississippi; and that with the said assets in hand and said subscriptions, if the complainant also became a subscriber for a liberal amount, upon the same terms as the other subscribers, the company would have ample means to construct and equip the said railroads and have them in operation at the period contemplated by the charter. The bill alleges that the representations were not true, and were made in bad faith, to deceive the complainant and induce him to act, in relation to said proposed arrangement, in error of facts as to the condition of the company in regard to the possession of the means requisite for the construction and equipment and putting in operation of the said railroads, and in regard to the immediate intent of the company to prosecute and complete the same. The Exhibits E and F were produced in the evidence taken in the cause, and are before the court. The fact that after the agreement was made, very little of these large amounts of money was forthcoming, even to pay the floating debt of the company, and that very little was expended during the following season on the

works, and that the company was obliged absolutely to suspend operations in October, 1872, was sufficient, if the complainant understood the representations as stated by the bill, to raise in his mind the strongest suspicions that he had been deceived and duped. The answers furnish but little light on the subject. They are not sworn to, and consequently are not evidence. Those of the trustees of the several mortgages are filed by them as such trustees, and claim that they are not affected by any rights of the complainant growing out of the transactions between him and the company.

The evidence is more to the point. (Here the learned judge went into an elaborate discussion of the evidence. This discussion is omitted.)

In charges of this kind, laid as a ground for setting aside a contract where many things have been performed on both sides, and where a rescission would involve the upsetting of many large and important transactions, the proof must be very clear indeed of fraudulent misrepresentation or concealment, to justify a court in applying the judicial knife to the case. It must be clear that there has been such a misstatement of the facts as to mislead the injured party, and to induce him to enter into the transaction; and he must be prompt to avail himself of the objection as soon as it is discovered. He must not wait to experiment and see whether it may not, after all, turn out well. Acquiescence for a little time, in such cases, is condonation. I am not satisfied that there was any such misrepresentation of facts in this case as, under the circumstances, entitles the complainant to set aside the contract.

The next question is, whether the complainant is entitled to have the contract rescinded on account of nonperformance by the railroad company of their part of it. The demand for rescission on this ground rests upon the peculiar law of the state of Louisiana before referred to. If the contract is to be governed by that law, I should have no hesitation in saying that the complainant is entitled to the relief which he asks. The building of the railroad beyond Brashear City, so as to give the complainant a through connection between his Opelousas road and Texas, was undoubtedly a material consideration with him, amongst the other considerations moving to the contract. The contract was a commutative one. In that respect it fully met the definition of the Louisiana Code, which declares (article 1768): "Commutative contracts are those in which what is done, given or promised by one party is considered as equivalent to, or a consideration for what is done, given or promised by the other." It becomes material, therefore, to ascertain whether the contract is to be governed by the law of Louisiana. The general rule is, that a contract is to be governed as to its interpretation, its nature,

its obligation, and its performance or dissolution, by the law of the place where it is made or entered into. In other words. "Lex loci contractûs est lex contractûs." The first and principal exception to this rule is, that if the contract is made in one state or sovereignty, and is to be performed in another state or sovereignty, it is to be governed by the law of the place of performance, because it will be presumed that the parties had the laws of the latter place in view when they entered into the contract. The rule and the exception have been fully discussed and commented upon by Mr. Justice Story in his Conflict of Laws, and by many other writers on private international law, and it is unnecessary to review those discussions here. In this case the contract was made in New York by persons who resided there. The railroad company, it is true, was a corporation originally chartered by Alabama. and subsequently capacitated by the laws of Louisiana and Texas to exercise all its faculties in those states; but its directors and officers mostly resided in New York and other Northern states, and its principal office was in New York, and the meetings of its directors were usually held there. In this case, all the negotiations which led to the contract were carried on in New York, and the contract itself was concluded and executed there. But, on the other hand, the interests, operations and property, which formed the principal object of the contract, were located in the Southern states bordering on the Gulf of Mexico, to wit: Alabama, Mississippi, Louisiana and Texas, and largely in the state of Louisiana. The contract was made with reference to these interests, operations and property, but its direct object, that is, the things stipulated and agreed to be done and performed, were to be. or might be in part, done and performed in New York as well as in the states referred to. This will appear when we look at the contract a little more particularly. It is altogether a personal contract, providing for the doing of certain acts on the one side, and on the other. Its object was a settlement of controversies, and a discontinuance of business opposition between the parties. It is evident that many of the acts stipulated to be done could be, and in fact were, done in the city of New York. There Morgan executed and delivered to the company the various deeds and transfers of property which he had agreed to do; the conveyances of the property in Mobile, the bills of sale of the steamers, the transfer of Pontchartrain Railroad Company stock, the conveyance of the railroad rights north and west of Brashear City. There he made his stipulated subscription to the securities of the railroad company. There the company delivered to him the said securities, namely, the bonds and certificates of stock. But the discontinuance of the steamboat business between Mobile and New Orleans and the delivery of the property con-

sequent upon the said conveyances were done in Alabama and Louisiana; and the building and completion of the railroad beyond Brashear City were necessarily to be done in the latter state. Now, by what law is such a contract to be governed, where it is executed in one state, and is partially to be performed in that state, and partially in other states?

I have no difficulty in saying that the conveyances and transfers to be made in pursuance of the contract were to be made in conformity with the laws of the states respectively in which the property, when consisting of realty, or subject to local law, was situated. And such conveyances and transfers, when executed, would be governed by the lex rei sitae. But that does not answer the question as to what law the principal contract is to be governed by. In Louisiana, nonperformance of a material stipulation renders the whole contract liable to be dissolved. But no one would apply that rule of Louisiana law to a contract not subject to its dominion, even though the breach should occur in Louisiana. The fact, therefore, that one of the acts to be performed in this case —the construction of the railroad—was to be performed in Louisiana, will not help to resolve the question, unless we can affirm that the entire contract is to be governed by Louisiana law. Does the fact, that a portion of the contract must necessarily be performed in Louisiana, subject it to that condition? If that does, then the like fact that a portion of the contract is necessarily to be performed in Alabama would subject it to Alabama law, and make it an Alabama contract. In this embarrassment, I do not know that I can do better than to fall back on the general rule that a contract is to be governed by the law of the place where it is made. The presumption, that where a contract is to be performed in a different jurisdiction, the parties must be intended to have in view the laws of the latter, seems to be repelled when the performance is to take place in several different jurisdictions. For when there are two equal and opposite presumptions, neither of them can prevail. The present case is still stronger; for much of the contract was performable, and actually performed in the place where it was made. I do not mean to say that where the main and principal part of a contract is to be performed in a state different from that in which it is made, the presumption will not arise that it is made in reference to the laws of such place of performance, even though some minor and incidental parts are required to be performed in still different states. Such may, very possibly, be the result in many instances that may occur. When they happen they will be governed by the force of their own circumstances. But I do not see that I am called upon to apply any such exceptional rule in this case. The building of the railroad in question was a very important consideration it is true; but the contract embraced many other considerations equally important, that were not necessarily to be performed in Louisiana.

The conclusion, therefore, to which I am forced to come is, that the principal contract, made on the 12th of December, 1871, between the complainant and the New Orleans, Mobile & Texas Railroad Company, was a New York contract, governed, as to its nature and obligation by the laws and jurisprudence of the state of New York; and as by these laws and jurisprudence, so far as appears, no such dissolving consequence follows from a nonperformance of part of the contract, as is claimed in this case, the claim is untenable, and the relief must be refused. As no relief can be granted on either of the grounds laid in the bill of complaint, the same must be dismissed with costs.